**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TYREEK JACKSON,** | : | |
| **Plaintiff** | : | No. 1:22-cv-00845 |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **BERNADETTE MASON, <u>et</u> <u>al.</u>,** | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

The instant civil action involves a pro se prisoner-plaintiff's claim under 42 U.S.C. §
1983 for retaliation in violation of the First Amendment to the United States Constitution as well
as his state-law negligence claim, both arising out of his general allegation that five (5) prison
officials—three (3) named Defendants and two (2) Doe Defendants—lost his personal property
which mainly consisted of various legal materials pertaining to his other state and federal cases.
Currently before the Court are the parties' cross-motions for summary judgment, Plaintiff's
motion to amend or supplement his complaint, and Plaintiff's two (2) motions for appointment of
counsel. For the reasons set forth below, the Court will: (1) dismiss Plaintiff's claims against the
two (2) Doe Defendants because he did not identify them through the course of discovery; (2)
deem withdrawn Plaintiff's motion to amend or supplement his complaint since he failed to file a
supporting brief in accordance with the Local Rules; (3) grant summary judgment <u>sua</u> <u>sponte</u> in
Defendants' favor on Plaintiff's Section 1983 claim due to his failure to exhaust his
administrative remedies; (4) decline to exercise supplemental jurisdiction over Plaintiff's
remaining state-law negligence claim and, consequently, dismiss that claim without prejudice;
and (5) deny as moot the parties' cross-motions for summary judgment as well as Plaintiff's two
(2) motions for the appointment of counsel.

## I.   BACKGROUND

Pro se Plaintiff Tyreek Jackson ("Jackson"), a convicted and sentenced state prisoner,[1] commenced this action by filing a complaint in the Court of Common Pleas of Schuylkill County on April 19, 2022.  (Doc. Nos. 1 ¶ 2; 1-1 at 4–10.)  In his complaint, Jackson names as Defendants: (1) Bernadette Mason ("Mason"), the Superintendent of Pennsylvania State Correctional Institution Mahanoy ("SCI Mahanoy"); (2) Correctional Officers Harris ("Harris"), Evans ("Evans"), Davis ("Davis"), and Cobian ("Cobian"), four (4) SCI Mahanoy Correctional Officers; and (3) John Doe #1 and John Doe #2 (collectively, the "Doe Defendants"), two (2) additional SCI Mahanoy Correctional Officers.  (Doc. No. 1-1 at 4–5.)  Defendants are being sued in their individual capacities.  (Id. at 5.)

For his factual allegations, Jackson avers that while incarcerated at Pennsylvania State Correctional Institution Chester ("SCI Chester"), Superintendent Marirosa Lamas allowed him to "purchase an additional Foot-Locker [sic] for the purpose of storing the [l]egal material [he] possess[es] due to many open [c]riminal [and c]ivil cases" on August 13, 2019.  See (id. at 5, 12).  More than two (2) years later, Jackson was placed in the Restricted Housing Unit ("RHU")/Diversity Treatment Unit ("DTU") at SCI Mahanoy.  (Id. at 5.)

On December 29, 2021, SCI Mahanoy's Security Department retrieved Jackson's property, and Evans along with the Doe Defendants packed it.  (Id.)  Regarding the retrieval and packing of a prisoner's personal property, Jackson believes that "all [p]roperty that is packed 'must be inventoried by a[] staff member' to assure that all the contents are recorded" and, "[i]f a prisoner is not present to participate then two (2) staff members must inventory and pack the prisoners [sic] property, followed by stating the reason why the prisoner wasn't able to pack

---

[1]  Jackson is presently confined at Pennsylvania State Correctional Institution Coal Township.

[and] inventory there [sic] own property." See (id.). Jackson's property remained with the Security Department from December 29, 2021, until January 12, 2022. (Id.) During this time, Jackson was housed in the RHU/DTU and was unable to inventory his personal property due to the Security Department's possession of his property. (Id.)

Jackson was taken to Lehigh Valley Hospital Center on January 14, 2022, so he could have surgery. (Id. at 6.) A week later, he returned to SCI Mahanoy. (Id.) On January 22, 2022, RHU Lieutenant Rodriguez returned some of Jackson's personal property to him. (Id.) Jackson also found a confiscation slip enclosed with his property. (Id. at 6, 13.)

Upon reviewing his returned property, Jackson observed that he was missing "his approved second [f]oot[l]ocker that contained all of his [l]egal [m]aterials pertaining to his [p]ending [c]riminal and [c]ivil [c]ases." See (id. at 6, 14.) He then wrote several Inmate Requests to Staff to Mason, the Security Department, and the Commonwealth of Pennsylvania Department of Corrections ("DOC")'s Central Office about his missing property. (Id. at 6.) He also filed a grievance about his missing property on or about January 24, 2022 ("Grievance No. 965217"). (Id. at 6, 15.)

Cobian responded to Grievance No. 965217 via an Initial Review Response and acknowledged therein that Harris, Evans, and John Doe #1 removed an extra footlocker from his cell, but that nothing was missing because his belongings from his second footlocker were placed into his other footlocker. (Id. at 6, 17.) Despite this information in her Initial Review Response, Cobian summoned Jackson to her office on February 14, 2022, and admitted to him that her staff lost his legal materials. (Id. at 6.) She told Jackson that since he "received a [d]eadline o[f] February 18, 2022 from the Pennsylvania Supreme Court[,]" he "could have the [c]ourts contact her to verify that all the materials were lost." See (id. at 6–7, 20.) She also "lied [to him by]

3

stating that [he] would [sic] contact his [a]ttorneys to replace the missing [l]egal [m]aterials."
<u>See</u> (<u>id.</u> at 6).

Jackson appealed from Cobian's Initial Review Response to the Facility Manager, who
denied the appeal. (<u>Id.</u> at 7, 18–19.) Jackson then filed a timely appeal for final review, which
was also denied. (<u>Id.</u> at 7.) Jackson avers that while "exhausting [his] grievance, [he] spoke to .
. . Cobian[,] and she stated that the reason why [his] property went missing is because [he] likes
to file grievances and lawsuits against her fellow staff members." <u>See</u> (<u>id.</u>).

At no time did Defendants find or return Jackson's missing property. (<u>Id.</u>) They also did
not "reimburst [sic] his missing personal property." <u>See</u> (<u>id.</u>). Jackson claims that SCI Mahanoy
"has a history o[f] negligently handling prisoners [sic] personal property while the property is
left in their possession." <u>See</u> (<u>id.</u>).

Based on these allegations, Jackson asserts claims for: (1) negligence against Evans,
Harris, and the Doe Defendants based on his lost property; (2) a Section 1983 claim for a
violation of the Eighth Amendment because "Mason, Cobian, Harris, Evans, Davis[,] et al. [sic].
. . failed to enforce and or [sic] train[] their [l]ow [r]anking employee's [sic] and or [sic] having
a[ p]ractice/custom of handling prisoners [sic] personal property negligently"; and (3) a First
Amendment violation because Defendants unlawfully retaliated against him "because [he] had
filed past grievances and lawsuits against [DOC] and Medical Departments [sic] staffmembers
[sic]." <u>See</u> (<u>id.</u> at 8–9). For relief, Jackson primarily seeks monetary damages. (<u>Id.</u> at 9.)

Defendants were served with Jackson's complaint on May 10, 2022 (Doc. No. 1 ¶ 3), and
they removed the action to this Court on May 27, 2022. Four (4) days later, Defendants filed a
motion to dismiss the complaint along with a brief in support of the motion. (Doc. Nos. 5, 6.)
Jackson responded to the motion by filing a letter objection (dated June 10, 2022) in which he

complained about Defendants removing the matter to federal court (Doc. No. 7) as well as a motion to appoint counsel (Doc. No. 8).

On May 30, 2023, the Court issued a Memorandum and Order granting in part and denying in part Defendants' motion to dismiss and denying without prejudice Jackson's motion for appointment of counsel.[2]  (Doc. Nos. 10, 11.)  Per the Court's disposition of Defendants' motion to dismiss, Jackson's claims under Section 1983 for violations of his rights under the Eighth and Fourteenth Amendments were dismissed with prejudice and his Section 1983 claims against Mason and Davis were dismissed without prejudice due to his failure to allege their personal involvement in any unconstitutional conduct.[3]  (Doc. Nos. 10 at 12, 15–16, 19–25; 11 at 1.)  The Court denied the motion to dismiss insofar as it sought to dismiss Jackson's First Amendment retaliation claim and his state-law negligence claim as asserted against Cobian, Evans, Harris, and the Doe Defendants.  (Doc. Nos. 10 at 16–19, 26–28; 11 at 1.)  The Court also granted Jackson leave to file an amended complaint to the extent he could allege the personal involvement of Mason and Davis in his remaining First Amendment retaliation claim.  (Doc. Nos. 10 at 28–29; 11 at 2.)  The Court directed Jackson that he could notify the Court if he did not want to file an amended complaint and instead proceed on his original complaint as it stood following the resolution of Defendants' motion to dismiss.  (Doc. No. 11 at 2.)

On June 9, 2023, Jackson filed a notice in which he indicated his desire to proceed on his original complaint and proceed to discovery on his First Amendment retaliation claim and state-

---

[2]  The Court determined that Jackson's complaint was properly removed based on the Court's original jurisdiction over his federal claims and supplemental jurisdiction over his state-law claims.  (Doc. No. 10 at 8–10.)

[3]  Although Jackson did not state that he asserted a claim under the Fourteenth Amendment, the Court liberally construed his complaint as possibly asserting such a claim.  (Doc. No. 10 at 22.)

law negligence claim.  (Doc. No. 12.)  Two (2) weeks later, the Court issued an Order explaining

that, due to Jackson's notice, the case would proceed on only his First Amendment retaliation

claim and state-law negligence claim against Cobian, Evans, Harris, and the Doe Defendants.

(Doc. No. 14 at 1.)  The Court also directed the Clerk of Court to terminate Mason and Davis as

Defendants and established deadlines for discovery and the filing of dispositive motions.  (Id.)

     Cobian, Evans, and Harris (hereinafter "Defendants") filed an answer with affirmative

defenses to the complaint on June 23, 2023.  (Doc. No. 15.)[4]  On August 30, 2023, Jackson filed

his second motion for the appointment of counsel (Doc. No. 23), which the Court denied without

prejudice via an Order issued on September 5, 2023 (Doc. No. 24).

     Defendants filed a motion for summary judgment, a statement of undisputed facts, a

supporting brief, and an appendix of exhibits on February 20, 2024.  (Doc. Nos. 30–32.)

Jackson, after receiving an extension of time to file his own motion for summary judgment, filed

a cross-motion for summary judgment and a supporting brief on March 19, 2024.  (Doc. Nos. 29,

34, 36, 37.)  A week later, Defendants filed a brief in opposition to Jackson's motion for

summary judgment, an answer to Jackson's statement of undisputed facts, and a supplemental

exhibit.  (Doc. Nos. 39–41.)  On April 12, 2024, Jackson filed his third motion for appointment

of counsel, a reply brief in further support of his motion for summary judgment, a "Counter to

Defendants' Counter Statement of Material Facts," and a supplemental appendix.  (Doc. Nos.

41–44.)  On August 29, 2024, Jackson filed his fourth request/motion for appointment of counsel

(Doc. No. 45) and a motion to "Amend and or [sic] Add to the Current Petition" (Doc. No. 46).

He did not file a brief in support of his motion to amend or supplement his complaint.

---

[4]  The affirmative defense of failure to exhaust administrative remedies under the Prison
Litigation Reform Act of 1996, 42 U.S.C. § 1997e(a) is included among Defendants' affirmative
defenses.  See (id. at 4).

On September 25, 2025, Defendants filed a supplement to their appendix in support of their motion for summary judgment. (Doc. No. 53.) The parties' motions are ripe for disposition.

## II.    LEGAL STANDARDS

### A.    Motions for Summary Judgment Under Federal Rule of Civil Procedure 56

The Court must render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. See id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). A dispute of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Anderson, 477 U.S. at 257. When determining whether there is a genuine dispute of material fact, the Court must view the facts and all reasonable inferences in favor of the nonmoving party. See Anderson, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor.").

To avoid summary judgment, the nonmoving party may not rest on the unsubstantiated allegations of their pleadings. When the party seeking summary judgment satisfies their burden to demonstrate the absence of a genuine dispute of material fact, the burden of production shifts to the nonmoving party, who must "go beyond the pleadings" with affidavits, "depositions,

answers to interrogatories, and the like" to show specific material facts giving rise to a genuine

dispute.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); id. at 328 (White, J.,

concurring).  The nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts."  See Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986) (citation omitted).  Instead, they must produce evidence to show

the existence of every element essential to their case that they bear the burden of proving at trial,

for "a complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial."  See Celotex Corp., 477 U.S. at 323; see also

Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992) (explaining that since plaintiff had the

burden of proof, "he must make a showing sufficient to establish the existence of every element

essential to his case" (citations omitted)).

     As noted supra, when determining whether a dispute of material fact exists, the Court

must consider the evidence in the light most favorable to the non-moving party.  See Matsushita

Elec. Indus. Co., 475 U.S. at 588 (citation omitted).  In doing so, the Court must "accept the non-

movant's allegations as true and resolve any conflicts in [their] favor."  See White v.

Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988), abrogated on other grounds by Hazen

Paper Co. v. Biggins, 507 U.S. 604 (1993).  However, a party opposing a summary judgment

motion must comply with Local Rule 56.1, which specifically directs the oppositional party to

submit a "statement of the material facts, responding to the numbered paragraphs set forth in the

statement required [to be filed by the movant], as to which it is contended that there exists a

genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the

statement required to be served by the moving party will be deemed to be admitted."  See L.R.

56.1.  A party cannot evade these litigation responsibilities in this regard simply by citing the fact

that they are a pro se litigant because these rules apply with equal force to all parties.  See Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 245 (3d Cir. 2013) (noting that pro se parties "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants").

Even if the Court deems the facts in the moving party's submission to be admitted due to the nonmoving party's failure to comply with Local Rule 56.1, the Court cannot simply grant the motion for summary judgment as unopposed.  Instead, the Court can only grant the motion if the Court "find[s] that judgment for the moving party is 'appropriate.'"  See Anchorage Assoc. v. V.I. Bd. of Tax Rev., 922 F.2d 168, 175 (3d Cir. 1990).  The analysis for determining whether judgment is "appropriate" depends on whether the party moving for summary judgment bears the "burden of proof on the relevant issues":

> Where the moving party has the burden of proof on the relevant issues, this means that the district court must determine that the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law.  Where the moving party does not have the burden of proof on the relevant issues, this means that the district court must determine that the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law.

See id. (citing Celotex Corp., 477 U.S. 317).

The above standards do "not change when the issue is presented in the context of cross-motions for summary judgment."  See Appelmans v. City of Philadelphia, 826 F.2d 214, 216 (3d Cir. 1987).  "When confronted with cross-motions for summary judgment, the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard."  Marciniak v. Prudential Fin. Ins. Co. of Am., 184 F. App'x 266, 270 (3d Cir. 2006) (unpublished) (citations omitted); see also Auto-Owners Ins. Co. v. Stevens & Ricci Inc., 835 F.3d 388, 402 (3d Cir. 2016) (explaining that when cross-motions for summary judgment are filed, "the court must rule

9

on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard").  "If review of cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving the judgment in light of the law and undisputed facts."  Transguard Ins. Co. of Am., Inc. v. Hinchey, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006) (citing Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998)).

### B.    Section 1983

Section 1983 is the vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials.  See 42 U.S.C. § 1983.  This statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

See id.  "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors."  See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002)).  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).

## III.    DISCUSSION

The parties have filed cross-motions for summary judgment and Jackson has filed two (2) motions for the appointment of counsel and a motion for leave to amend his complaint.  The

Court will first address Jackson's claims against the Doe Defendants before addressing the parties' respective motions.

### A.      Jackson's Claims Against the Doe Defendants

To date, Jackson has failed to identify the Doe Defendants and discovery has already closed.  "Claims against John or Jane Doe defendants are properly dismissed when the defendants have not been identified prior to the discovery deadline."  <u>Smith v. Hendrick</u>, No. 21-cv-01704, 2024 WL 4244831, at *3 (M.D. Pa. Sept. 19, 2024) (citing cases).  Accordingly, the Court will <u>sua</u> <u>sponte</u> dismiss Jackson's claims against the Doe Defendants because he did not identify them prior to the discovery deadline.

### B.      Jackson's Motion to "Amend and or [sic] Add to the Current Petition"

Jackson filed a motion to "Amend and or [sic] Add to the Current Petition" (Doc No. 46); however, he never filed a brief in support of the motion in accordance with the Local Rules.  <u>See</u> M.D. Pa. L.R. 7.5 ("Within fourteen (14) days after the filing of any motion, the party filing the motion shall file a brief in support of the motion .... If a supporting brief is not filed within the time provided in this rule the motion shall be deemed to be withdrawn.").  Therefore, the Court will deem this motion withdrawn.[5]

---

[5]  Even if the Court did not deem this motion withdrawn, the Court would deny it because Jackson seeks to supplement his complaint with allegations about events occurring while he was incarcerated at a different Pennsylvania prison, State Correctional Institution Benner Township, and not involving any of the Defendants.  <u>See</u> (Doc. No. 46 at 1–2).  To the extent that Jackson seeks to assert causes of action based on this alleged conduct, he will have to file a separate legal action.  The Court does not opine on the merits of any claim should Jackson file a civil case related to the allegations in his motion.

C.    **Cross-Motions for Summary Judgment**

1.    **Factual Record**[6]

a.    **Jackson's Deposition Testimony**

Jackson was housed in SCI Mahanoy's RHU from December 29, 2021, until January 14, 2022, while he awaited transportation to an outside hospital for surgery.  (Doc. No. 33-5 at 6.) He alleges that security came to his pre-RHU cell on December 29th and packed up his property at a time when he was not physically present at his cell.[7]  (Id. at 7.)  Jackson believes that according to the DOC's policy, security should have inventoried his property because he was not

---

[6]  Because the Court will grant summary judgment in Defendants' favor <u>sua sponte</u> on Jackson's Section 1983 First Amendment claim, the record has been compiled here without consideration of significant issues with Jackson's submissions.  For instance, Jackson never filed a "separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth" in Defendants' statement of material facts as required by Local Rule 56.1.  <u>See</u> M.D. Pa. L.R. 56.1.  This failure requires the Court to deem admitted Defendants' statement of material facts unless they are plainly contradicted by the record when resolving their motion for summary judgment.

Additionally, in Jackson's statement of material facts (Doc. No. 36 at 3–6) and counter to Defendants' counter statement to his statement of material facts (Doc. No. 45), he does not include any "references to the parts of the record that support the statements" as required by the Local and Federal Rules.  <u>See id.</u>; <u>see also</u> Fed. R. Civ. P. 56(c) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.").  As such, Jackson did not properly support his motion for summary judgment.

[7]  Jackson has not pointed to any evidence in the record showing that his property was picked up on December 29th, especially considering that he was not present at the time.  Instead, and as discussed <u>infra</u>, he appears to base his belief on hearsay evidence in the nature of statements from other correctional officials.

present and did not have a cellmate at the time he was transferred to the RHU.  (Id.)  Jackson

does not believe his property was inventoried; instead, security "just packed it."  See (id.).

While he was in the RHU, Jackson asserts that he was not provided with certain basic

items of his personal property, such as clothing and toiletries, which he should have received

upon his transfer to the RHU.  (Id. at 7, 8.)  After several days, Jackson inquired about the status

of his personal property.  (Id. at 8.)  In response, Jackson was told that his property was not

inside the RHU's storage area, and that security had his property.  (Id.)

Jackson returned from the hospital on January 21, 2022, and he inquired about the status

of his personal property on January 22, 2022.[8]  (Id.)  He was then brought out to where his

personal property was located.  (Id.)  He noticed that items were missing "because it was light,"

see (id. at 9), and as a result, he would not sign for the property (id. at 8, 9).  The missing

property included Jackson's legal materials, his radio, and a few other items.  (Id. at 9–10.)

Those legal materials, which included medical records, were not items he could obtain from his

counsel or the hospitals.  (Id. at 12.)  He had hospital records that were over ten (10) years old,

and those records were discarded when "[e]verything went from paper to electronic."  See (id. at

_____

[8] Jackson's deposition testimony is inconsistent regarding when he first noticed his property was
missing because he initially testified that the date was January 12, 2022:

> So it went from the 29th December of '21 until the 12th of January of '22, my
> property was retrieved, meaning that security brought it out of their area and brung
> it to the RHU's property area.

> Then they brought me out my [sic] cell on the 12th, then they said, well, this is the
> stuff.  I said, well, I'm not signing a DC-153 because a lot of my belongings is
> missing.

See (id.).  However, he later clarified that the date he noticed his property missing was January
22, 2022.  (Id. at 8, 9.)  Based on this clarification, the Court uses this date instead of January 12,
2022.

12, 14).  Also, he had trial transcripts from his 1998 criminal case that do not exist anymore.  (Id. at 13.)  Overall, he had "trial transcripts, preliminary hearing transcripts, bail transcripts, district court, lower courts, superior, [and] supreme court" for his criminal cases.  See (id. at 14).

Inside Jackson's property when it was brought to the RHU was a confiscated item receipt dated January 11, 2022.  (Id. at 12.)  Jackson believes that this "clearly shows" that his property was with security from December 29, 2021, until January 11, 2022.  See (id. at 12–13).  He does not know why the slip contains the date "1/24/22" and what appears to be a small signature below it.  See (id. at 13).[9]

Once the security department packed Jackson's property on December 29th, he does not know what happened with his property.  (Id. at 9.)  After Jackson returned from the hospital, he was informed by a non-defendant "block" or "unit" officer that a camera recording showed that Evans was one of the individuals who packed up Jackson's property on December 29th.[10]  See (id. at 7, 8).

_____

[9]  Jackson attaches a copy of the referenced confiscation slip (dated November 11, 2022) to his complaint, and this slip does not list any confiscated items and contains what appears to be a signature next to "11/24/22" in the area where confiscated items should be identified.  See (Doc. No. 1-1 at 13).  As part of their answer to Jackson's statement of facts, Defendants submit a copy of a confiscated items receipt with the same date (November 11, 2022), which lists three (3) items as having been confiscated and contains what appears to be a staff member's signature at the bottom.  See (Doc. No. 40-1 at 2).

[10]  It does not appear from Jackson's deposition testimony that he personally viewed any camera footage of this event.  Rather, he testified that the "block officer" viewed it and then told Jackson what they saw.  See (id. at 7 ("Well, on the camera, - on the camera when I asked – when I asked the block – when I asked my block officer, he stated that Evans was one and he stated the other, I can't remember the name, but he said that Evans was one of them that had my property, you know, he came and got it."); id. at 8 ("Q. So, paragraph 16 [of your complaint] says Evens and two D.O. officers packed your property on December 29th.  If you weren't there, how do you know there were three officers?  A. Well, because my housing unit officer told me.").

To the extent that Jackson's information is based on statements made to him by this non-defendant officer, it constitutes inadmissible hearsay because Jackson is offering the officer's

There are rules as to how much property an inmate can possess.  (Id. at 9.)  SCI Chester allowed Jackson to have an extra footlocker in approximately August 2019, and he kept his legal materials inside of it.  (Id. at 6, 9.)  Jackson never asked whether he could keep an extra footlocker while incarcerated at SCI Mahanoy.  (Id. at 9.)  He recognizes that SCI Mahanoy had property sheets indicating that he had only one (1) footlocker; however, he explained that while one (1) footlocker arrived with him "on the bus," he was charged to transport the second footlocker to him at SCI Mahanoy in approximately March 2021.  See (id.).  Prior to his time in the RHU starting on December 29, 2021, no one at SCI Mahanoy said anything to him about having two (2) footlockers.  (Id.)

Jackson wrote Mason on February 2, 2022, and provided her with a list of items that were missing.  (Id. at 10.)  This letter was attached to Jackson's complaint and stated as follows:

> Dear Warden; [sic]
>
> It's now been over 2wks that your Security Dept. lost my [b]elongings containing my [l]egal [m]aterial.  I cannot reply, answer or file my [a]ppeal for my [p]ending DEADLINE of FEBRUARY 18, 2022 to the Pennsylvania Supreme Court.  (See inclosed [sic] document).
>
> I'am [sic] missing the following:
>
> - **Trial Transcripts**
> - **Preliminary Hearing Transcripts**
> - **Bail Hearing Transcripts**

---

statement to prove that Evans removed his property.  See Fed. R. Evid. 801(c) ("'Hearsay' means a statement that: **(1)** the declarant does not make while testifying at the current trial or hearing; and **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement."); Fed. R. Evid. 802 ("Hearsay is not admissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court.").  As such, this Court cannot consider it when determining whether a genuine dispute of material fact exists.  See Fraternal Ord. of Police, Lodge 1 v. City of Camden, 842 F.3d 231, 238 (3d Cir. 2016) (alteration omitted) ("[H]earsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial." (quoting Stelwagon Mfg. Co. v. Tarmac Roofing Sys., 63 F.3d 1267, 1275 n.17 (3d Cir. 1995))).  The statement is referenced here only for the sake of completeness.

- **PCRA Transcripts**
- **Motion Hearing Transcripts**
- **Direct Appeal Petitions**
- **Appeal Petitions**
- **Reconsideration Petitions & Transcripts**
- **PSI Reports**
- **Medical Records (5000 Plus Pages) 2016-Present**
- **Madamus** [sic] **Petition, Arguments & Motions Filed**
- **Sentencing Transcripts**
- **Parole Appeals, Green Sheets, Administrative Appeal Petitions**
- **Medical Records (Federal Bureau of Prisons) 2014-2016**

My Criminal & Civil Case No. are listed below:

    **I.  United States of America v. Tyree Jackson, 14-413-01**
    **II.  Commonwealth v. Jackson, CP-51-CR-0011388-2007**
    **III. Commonwealth v. Jackson, CP-51-CR-0007006-2012**
    **IV. Commonwealth v. Jackson, CP-51-CR-0059-1998**
    **V.  Jackson v. Little, 19-CV-05824**
    **VI. Jackson v. PA Dept. of Corrections, 650-MD-2019**

       ***Warden Mason will you provide me with a letter verifying that your guards lost, misplaced or destroyed my [l]egal [m]aterial ?*** [sic]

See (Doc. No. 1-1 at 14).[11]

       Jackson filed a civil action, Jackson v. Little, No. 19-cv-05824, in the United States

District Court for the Eastern District of Pennsylvania. (Id. at 13.) He filed it while incarcerated

at SCI Chester, and his lawsuit was against the medical department there arising from an alleged

misdiagnosis. (Id.) The case ultimately settled. (Id.)

       As of the date of his deposition (December 21, 2023), his 2007 and 2012 Pennsylvania

state criminal cases as well as his 2014 federal criminal case were still pending insofar as his

---

[11]  This letter was not introduced during Jackson's deposition. Nevertheless, because Jackson discussed it during his deposition and attaches it to his complaint, it is included here for the sake of completeness.

"Federal lawyers [were] . . . filing for a termination of federal supervision."  See (id. at 13).[12]
Jackson is also trying to get his 1998 criminal case expunged.  (Id.)  His civil cases have
concluded.  (Id.)

Regarding his allegations against Cobian, Jackson points out that she is a security
lieutenant who "tells them where to go down there," "tells who what to do on what shift, who's
under her tool [sic] is [sic] it, instructs them to go down and search whoever [sic] or lock this
person up, whatever the case may be."  See (id. at 10).  During a conversation between him and
Cobian on February 14, 2022, she told him that they "lost or misplaced" his property.  See (id.).
Jackson explained to her that he had a court deadline to file something and now lacked his
"documentation," to which she directed him "to have the courts contact [her] and [she will]
verify it."  See (id.).  Jackson further described their conversation as follows:

> She tried to get me to sign off on a grievance, like, you know, on a threat, like, you
> might as well sign this over.  Oh, we broke your remote to the TV, this is missing,
> we can give you a whole new TV, you know, X, Y, and Z.

---

[12]  In his statement of facts in support of his motion for summary judgment, Jackson asserts that
his "court deadline of February 18, 2022 came and went as [he] has become time-barred due to
their negligence," and that he was "not able to file a mandatory brief for the said courts."  See
(Doc. No. 37 ¶ 15).  Jackson does not cite to any evidence in the record to support this statement,
and the publicly available docket entries do not support this assertion.  In this regard, Jackson
attaches a letter to his complaint from his counsel in which they notify him that he has until
February 18, 2022 to file a petition for allowance of appeal with the Pennsylvania Supreme
Court if he wanted to challenge the Pennsylvania Superior Court's decision affirming a decision
of the PCRA Court.  (Doc. No. 1-1 at 20.)  Jackson's attorney states that the docket number for
the Superior Court case is No. 418 EDA 2021.  (Id.)

According to the docket available on the Unified Judicial System of Pennsylvania Web Portal
(https://ujsportal.pacourts.us/CaseSearch (last visited September 19, 2025)), Jackson timely filed
a petition for allowance of appeal with the Pennsylvania Supreme Court on February 13, 2022,
and the Supreme Court denied his petition on July 11, 2022.  See Docket, Commonwealth v.
Jackson, No. 44 EAL 2022 (Pa. filed Feb. 13, 2022) (showing that the docket number for the
Superior Court's decision was No. 418 EDA 2021).  The Court takes judicial notice of this
docket.  See Orabi v. Att'y Gen. of the U.S., 738 F.3d 535, 537 n.1 (3rd Cir. 2014) (stating that
the court "may take judicial notice of the contents of another [c]ourt's docket"); Wilson v.
McVey, 579 F. Supp. 2d 685, 688 n.5 (M.D. Pa. 2008) (taking judicial notice of court docket).

I'm like, that's irrelevant, where the fuck is my documentation at?  You can't get rid of a whole document, a whole footlocker.  Well, you like to file grievances, I heard you do lawsuits.  I said I don't do anything that's not warranted.  I've never done nothing in prison that wasn't warranted.

. . .

She's like, well, look, you can have – meaning, like, you can have this footlocker right here.  That's not my footlocker, and where's the – I don't care about the footlocker, I'm asking, where's the documentation at from inside the footlocker?

See (id.).  Cobian said to Jackson, "oh, yeah, you like filing lawsuits and grievances, that's why your property missing [sic]."  See (id. at 11).  Cobian did not tell Jackson who got rid of his property; instead, "[s]he just smiled at [him]."  See (id.).  Jackson also never asked Cobian who packed or retrieved his personal property because he was only concerned with getting his property back at the time.  (Id. at 12.)[13]

Jackson does not know whether Cobian did anything to his property.  (Id.)  However, he believes she did because she (1) does not like him, (2) "knew the whereabouts of [his] property," and (3) "she is a [correctional officer who] can orchestrate and tell anyone to do anything[, s]o she may not have a direct link to it, but she can actually be the causer of doing such."  See (id.).  He also believes that if she was not "guilty of doing something," Cobian "shouldn't have said what she said."  See (id. at 11).

As of the date of his February 14, 2022 conversation with Cobian, Jackson believes that he had one (1) lawsuit, which was "almost ready to pen, because [he] and the medical director [were not] seeing eye to eye."  See (id.).  He also had filed "multiple grievances . . . against the medical department in its totality."  See (id.).  Based on these grievances, Jackson believes that

---

[13]  Jackson might have had an additional conversation with Cobian about his property upon seeing her in a walkway on an unidentified date and time; however, it is unclear what they allegedly discussed during this conversation.  (Id. at 12.)

"they must tell security, like . . . you know, this guy, passive aggressiveness, like he's you know, when he comes up here, he's argumentative and so forth and so on." <u>See</u> (<u>id.</u>). He believes that "medical" must have told Cobian something because "that's why she stated, like, well, we're aware of what you do. You file grievances, you file lawsuits, and that's why your property became [sic] missing." <u>See</u> (<u>id.</u>).

Regarding his claims against Harris and Evans, Jackson does not know or remember if they transferred him to his cell in the RHU on December 29, 2021, but he thinks that they might have done so. (<u>Id.</u> at 11, 12.) Thereafter, "multiple . . . RHU officers went back to [Jackson's housing unit] and packed [his] property up." <u>See</u> (<u>id.</u> at 11). Jackson believes that what occurred is on camera and, thus, "they know exactly who did it." <u>See</u> (<u>id.</u> at 11). According to Jackson, this knowledge is demonstrated by Cobian "being sarcastic . . . and facetious" when Jackson met with her; it was "like she knew exactly where [his] property was at." <u>See</u> (<u>id.</u>). In addition, Jackson noted that "Harris and Evans is [sic] under the toolage [sic] of [C]obian, and they work for the security department, and they do come to search, . . . lock up, and . . . pack property up." <u>See</u> (<u>id.</u> at 12).

Jackson acknowledges that there is "only like a four-man roster with the search team." <u>See</u> (<u>id.</u>). He does not know if it is possible that the other two (2) of the four (4) security officers might have disposed of his property. (<u>Id.</u>) As of February 14, 2022, Jackson had not filed any lawsuits or grievances against Cobian, Harris, or Evans. (<u>Id.</u>)

### b.    Defendants' Declarations

Along with their statement of material facts, each Defendant submitted a declaration. (Doc. Nos. 33–6–33-8.) In Cobian's declaration, she denies losing or destroying Jackson's personal property and asserts that her "only role in this claim was answering . . . Jackson's

grievance."  See (Doc. No. 33-6 ¶¶ 3–4).  In Evans and Harris's declarations, they also deny

losing or destroying Jackson's personal property.  (Doc. Nos. 33-7 ¶ 3; 33-8 ¶ 3.)

### c.    The DOC's Inmate Grievance Process

The DOC has a policy, DC-ADM 804, governing the inmate grievance process, which

has been in effect since May 1, 2015, with amendments effective on February 16, 2016.  (Doc.

No. 32 ¶ 5.)  This policy, which is referred to as the "Inmate Grievance System," allows every

inmate in DOC custody to "have access to a formal procedure" through which the inmates can

"seek resolution of problems or other issues of concern arising during the course of [their]

confinement."  See (Doc. No. 33-3 at 2); see also (Doc. No. 33-4 ¶ 4 (stating that DC-ADM 804

"provides an administrative procedure through which inmates can seek resolution of problems

and remedies including monetary relief").

If a concern arises for an inmate, they are "encouraged to attempt resolution of [the]

concern informally by use of a DC-135A, Inmate Request to Staff Member or direct

conversation with the Unit Manager or Officer-in-Charge prior to submitting [a formal

grievance]."  See (Doc. No. 33-3 at 9 (emphasis omitted)).  Should the inmate decide to forgo

attempting to informally resolve their concern or the attempt at informal resolution is

unsuccessful, DC-ADM 804 sets forth a three (3)-step process for filing and resolving a formal

grievance.  See (Doc. No. 32 ¶ 6); see also (Doc. No. 33-3 at 9 ("While an inmate should make

every effort to resolve a concern informally prior to filing an official grievance, failure to attempt

to informally resolve a concern will not be cause to reject an official grievance.").

The first step involves the inmate submitting a grievance, using the DC-804, Part 1 Form,

within fifteen (15) working days after the event giving rise to their concern.  See (Doc. No. 33-3

at 9, 10).  The grievance must be submitted "with the Facility Grievance Coordinator/designee at

the facility where the grievance event occurred," <u>see</u> (<u>id.</u> at 10), by placing it in "a fixed lock-box designated for inmate grievances . . .," <u>see</u> (<u>id.</u> at 13).  The grievance must also, <u>inter</u> <u>alia,</u> (1) "be legible [and] understandable"; (2) contain "a statement of the facts relevant to the claim," with said statement "includ[ing] the date, approximate time, and location of the event(s) [giving] rise to the grievance"; (3) "identify individuals directly involved in the event(s)"; (4) "specifically state any claims [they] wish[] to make concerning violations of [DOC] directives, regulations, court orders, or other law"; and (5) "request the specific relief sought" if "the inmate desires compensation or other legal relief normally available from a court."  <u>See</u> (<u>id.</u> at 10).  In addition, "[a]n inmate filing a grievance related to a claim of missing property must provide documentation such as a DC-153A, Personal Property Inventory Sheet; DC-154A, Confiscated Items Receipt; or a Commissary/Outside Purchase Form for evidence or proof that the property items were once in [their] possession."  <u>See</u> (<u>id.</u> at 11).

Following the submission of a grievance, the Facility Grievance Coordinator/designee must assign it a grievance number, enter it into the Automated Inmate Grievance Tracking System, and review the grievance to determine whether it is properly submitted according to the procedures set forth in DC-ADM 804.  <u>See</u> (<u>id.</u> at 14–15).  If the Facility Grievance Coordinator/designee rejects the grievance because it was not properly submitted, it is returned to the inmate along with "a Grievance Rejection Form . . . enumerating the reason(s) the grievance was rejected."  <u>See</u> (<u>id.</u> at 15 (emphasis omitted)).  The inmate may then resubmit the grievance under the same grievance number "within five working days of the rejection notice date."  <u>See</u> (<u>id.</u> at 12).

If the Facility Grievance Coordinator/designee determines that the inmate properly submitted their grievance, the Facility Grievance Coordinator/designee "will designate a staff

21

member to serve as the Grievance Officer for that grievance." <u>See</u> (Doc. No. 33-3 at 14). This staff member serving as the Grievance Officer "shall not be directly involved in or named as the subject of the grievance . . . ." <u>See</u> (<u>id.</u>).

Once they complete their review of the grievance, the Grievance Officer must "submit their proposed response to the Facility Grievance Coordinator/designee prior to distribution to the inmate." <u>See</u> (<u>id.</u> at 15). The Grievance Officer's response must be "typed on the Initial Review Response Form" and "include a brief rationale summarizing the conclusion and any action taken or recommended to resolve every issue raised as well as any requested relief." <u>See</u> (<u>id.</u>). "[T]he response must include one of the following dispositions: Uphold Inmate, Grievance Denied or Uphold in Part/Deny in Part." <u>See</u> (<u>id.</u>). The response must also be "provided to the inmate within 15 working days from the date the grievance was entered into the Automated Inmate Grievance Tracking System" unless that time is temporarily extended as provided by DC-ADM 804. <u>See</u> (<u>id.</u> at 15–16).

If the inmate is dissatisfied with the Initial Review Response to their grievance, they can proceed to the second step of DC-ADM 804's procedures by appealing the response to the Facility Manager "within 15 working days from the date of the initial review response/rejection." <u>See</u> (<u>id.</u> at 18). Unless the Facility Manager remands the Initial Review Response or Initial Rejection to the Grievance Officer "for further investigation and/or reconsideration," <u>see</u> (<u>id.</u> at 20), they have "15 working days of receiving the appeal" to "notify the inmate using the Facility Manager's Appeal Response" Form of their decision on appeal. <u>See</u> (<u>id.</u> at 19 (emphasis omitted)). The Appeal Response must contain one of these dispositions: "Uphold Response, Uphold Inmate, Dismiss/Dismiss Untimely or Uphold in Part/Deny in Part." <u>See</u> (<u>id.</u>). It must

also include "a brief statement of the reason(s) for the decision" and address "[a]ll appeal points raised by the inmate." See (id.).

After the Facility Manager responds to them, a dissatisfied inmate can pursue the third and final step of DC-ADM 804's procedures by appealing the Facility Manager's Response for Final Review to the DOC Secretary's Office of Inmate Grievance and Appeals ("SOIGA"). See (id. at 21). The inmate has "15 working days from the date of the Facility Manager/designee's decision" to file their appeal with SOIGA. See (id.). SOIGA then has "30 working days of receipt" of the appeal to respond, unless the time is extended or SOIGA refers the appeal to "a bureau for review." See (id. at 24, 25). Once SOIGA completes its review, it "will respond directly to the inmate . . . using the Final Appeal Decision [Form] . . . or the Final Appeal Decision Dismissal [Form]." See (id. at 24). SOIGA's decision must have "one of the following dispositions: Uphold Response, Uphold Inmate, Dismiss, or Uphold in Part/Deny in Part." See (id.).

### d.    Jackson's Grievance(s)

From December 1, 2021, to March 1, 2022, Jackson filed four (4) grievances relating to property, only one of which was appealed to SOIGA for final review: Grievance No. 965217. (Doc. Nos. 32 ¶ 12; 33-2 at 2.) Grievance No. 965217, which is dated January 24, 2022 and received by the Grievance Coordinator on January 26, 2022, states as follows:

> This [g]rievance is in reference towards [sic] [a]dditional [p]roperty other than my [r]adio is missing ([f]oot locker [sic], [l]egal material, sitz bath)[.] My [r]emote [c]ontrol to my [t]elevision is broken in half ripped [sic] apart.
>
> I'am [sic] missing my [a]pproved 2nd [f]ootlocker[.] I entered SCI-MAH w/via [sic] SCI Chester and it's verified on my DC-153m, this [f]oot locker [sic] contained many [l]egal [d]ocuments, [b]riefs, [s]trategies[,] etc[.] for several of my pending [a]ppeals in [s]tate, [f]ederal[, and] Commonwealth Courts. Enclosed [a]pproval [s]lip from Warden Lamas. (Under previous #DY5817) just turned over in [l]ate 2019.

My [r]emote was in perfect condition upon entering SCI-Mah [sic], you can verify w/ property Sgt. Peek. On 12/29/21 check the camera's [sic], you'll see that Security Guard CO1 Harris [and] other [sic] literally slamming [and] dropping my belongings into the cart!

Lastly, where is my [s]its [b]ath for me to perform my daily bowel regiment? [I]t was not inside my property given to me as I urgently need to better cope with my [i]llness.

. . .

The process in which my personal belongings were handled was very rough [and] unprofessional. To [e]levate any [l]egal [a]ction against the perpetrators who committed this unjust, just [f]ind and or [sic] [l]ocate [and] [r]eturn my [l]egal [m]aterials, [f]oot[l]ocker, [s]itz [b]ath, but someone must replace my [r]emote [c]ontrol to my RCA TV immediately!

Money isn't my motive, I simply request my [b]elongings [n]ow!

Please Note: Security had my property from 12/29/21–1/12/22, RHU Staff NEVER inventoried my property as I left for [s]urgery on 1/14/22.

Thank you in advance, thank you for your time, [p]atience[,] and future assistance within this matter at hand.

See (Doc. No. 33-1 at 2–3). Jackson also indicated that he contacted "Warden Mason, Ms. Mahally, SGT. [sic] Berger, and others to no avail." See (id. at 2). There are no references to Cobian or Evans in Grievance No. 965217. (Id. at 2–3.)

Through an Initial Review Response dated February 15, 2022, Cobain responded to Grievance 965217 by upholding it in part and denying it in part. (Id. at 4.) The rationale for this decision was set forth as follows:

On 1/24/2022, you filed grievance #965217 and in your grievance you state that you were missing your 2nd approved footlocker containing legal mail material, a sits [sic] bath and your remote control was broken.

During my investigation of your grievance, I reviewed your documentation you provided from SCI Chester stating you were granted permission for a second footlocker. I find that the date was received by Superintendent Lamas was after the date that states you were granted the permission. I spoke with Unit Manager Holly

and Counselor Martino and neither of them had knowledge of any permission granted to have a second footlocker. The officers that transported your belongings to the RHU were interviewed and stated that they did remove an extra footlocker from your belongings and placed everything into one footlocker, nothing was confiscated. All medical supplies were returned to the medical department just incase [sic] you needed them in the RHU they would be assessable [sic] to medical to provide them to you[.] After our interview in my office on February 14, 2022 about your sits [sic] bath I called medical and as [sic] informed that the order for it was discontinued in January of this year. I was informed you made a request to have another order placed but it was not processed yet. Your remote control that you provided to me was damaged. I do understand it was old and taped together and believe it could have been damaged more from being packed and transported to the RHU because of it being so fragile. I did offer to retrieve another remote if there was one available or exchange your tv with one that has a working remote and have it placed on your property sheet. You told me don't worry about it you reached out to the attorneys to replace your paperwork and you were not to [sic] worried about your remote. You were informed that if you change your mind about your remote to contact me and I will take care of it.

Based on the above information, I consider this grievance to be upheld in part/denied in part and with no further action necessary.

See (id.).

In response to this Initial Review Response, Jackson filed an appeal to the facility

manager dated February 17, 2022. (Id. at 5.) In this appeal, Jackson stated:

Lt. Cobian lied regarding me stating I would reach out to my attorneys and get my legal documents/paperwork.

My property wasn't packed [and] inventoried when security retrieved my belongings on 12/29/21. Lt. Cobian verified that my legal materials were lost, and offered for me to have the courts contact her so the verification of all my legal materials was lost, or destroyed by security.

I'am [sic] currently missing the following attached: Please see the attached letter [and] confiscation slip.

DOC ADM 812 states that all property packed must be inventoried, which never occurred. Why wasn't my belongings inventoried?

My radio, footlocker [and] legal material wasn't placed on the confiscation slip I received with my belon[gings]. Security checked my property on Jan. 11 & 12, 2022 (Confiscation slip enclosed)[.]

Warden Mason, I urgently need all of my legal documents as my attorneys isn't [sic] sending copies or my 5[,]000 plus pages of medical records. So you [and] your underlings must replace or provide adequate funds to do so.

See (id. (cleaned up)).

Mason issued a Facility Manager's Appeal Response dated March 11, 2022, upholding the Initial Review Response to Jackson's grievance. (Id. at 6.) Mason's response indicated as follows:

I am in receipt of your grievance appeal in which you restate the claims made in your initial grievance regarding a missing additional footlocker, a sits [sic] bath[,] and a damaged remote control.

Upon review of all relevant information, I find that Lt. Cobian properly investigated your claims and provided you with a clear and thorough response. I see no reason why Lt. Cobian would note you were not worried about missing legal material if you did not indicate such during her interview with you. Additional issues you note in this appeal will not be addressed as they were not mentioned in your initial grievance.

As such, I am upholding the decision of the grievance officer and deny this appeal and any request for relief.

See (id.).

Following Mason's response, Jackson submitted an appeal for final review, dated March 12, 2022, to SOIGA. See (Doc. No. 53-1 at 3–7). In his appeal to SOIGA, Jackson complained as follows:

On 12/29/21 4PM [sic] I was taken to the RHU for security concerns. Security arrived afterwards and packed my personal belongings on this same day and shift.

I possessed 2 footlockers when I arrived [at] SCI-MAH [sic] on 3/17/21 via SCI-PHX [sic]. The Security Dept. failure to properly inventory my property has caused me to lose every piece of legal mail I owned for my numerous pending legal proceedings in federal, state, Commonwealth, [and] city courts.

Within thee [sic] initial review response, they clearly admitted I possessed 2 footlockers, and lied on me [sic] stating I'll have my attorney's [sic] replace the paperwork? [sic] That's totally absurd, and warrant's [sic] legal action for these criminal acts deliberately destroying my defenses, [sic] to my pending cases.

Enclosed is my recollection of missing legal documents.  Please check my legal mail received dates [and] legal conference call dates to show how many [and] much of [sic] I've obtained since the time I've been housed @ SCI-MAH.

Relief Sought:
Enclosed documentation w/ missing legal material or $50,000.00 fifty thousand U.S. dollars.

See (id. at 3).

SOIGA issued a Final Appeal Decision in which it upheld the resolution of Grievance

No. 965217.  (Doc. Nos. 37-1 at 7; 53-1 at 8–9.)  SOIGA explained its decision as follows:

You filed this grievance alleging to be missing your approved 2nd footlocker containing legal material, sitz bath[,] and that your remote control was damaged. You state that security had your property from 12/29/21-1/12/22 and claim that RHU staff never inventoried your property.  You express belief that the process in which your property was handled was very rough and unprofessional.

Review of the record determined that your concerns have been adequately and thoroughly addressed.  The record reflects that an investigation into your grievance was unable to find an active approval for an extra footlocker/legal material. Nonetheless, the record reflects that only the extra footlocker was removed and that the contents were placed into one footlocker.  In your appeal to final review, you claim the facility's responses are incorrect concerning your statement that you would reach out to your attorney to obtain copies of any alleged missing legal documents; however, as previously stated, the record indicates that your legal material was placed into one footlocker and none of it was confiscated.  You have failed to provide any additional information/evidence to support your claim of missing legal material.

Per the DC ADM 804 Section 2, B., issues presented in your appeal which weren't raised at the initial level will not be addressed.

Based on the aforementioned information, your appeal and requested relief are denied.

See (Doc. Nos. 37-1 at 7; 53-1 at 8).

## 2.    Analysis

In their motion for summary judgment, Defendants argue that the Court should grant

summary judgment in their favor on Jackson's First Amendment retaliation claim because (1) he

failed to exhaust his administrative remedies insofar as he never raised a claim for monetary damages or named Cobian and Evans in Grievance No. 965217, and (2) there is insufficient evidence to show causation.  (Doc. No. 31 at 6–10).  They also contend that they are entitled to summary judgment on Jackson's state-law negligence claim because there is insufficient evidence to show they were personally involved in any loss of his personal property.  (Id. at 10–12.)

In Jackson's motion for summary judgment, he asserts that he fully exhausted all available administrative remedies relating to his First Amendment retaliation claim.  See (Doc. No. 37 at 9–12).  He also contends that he has sufficiently established the causation element of a First Amendment retaliation claim because he alleges that Cobian told him that his prior grievances and lawsuits resulted in the loss of his legal materials.  (Id. at 14.)  He further argues that he has sufficiently shown Defendants' personal involvement in his retaliation and negligence claims and, therefore, he is entitled to summary judgment in his favor.  (Id. at 15–16.)

As explained below, although Defendants move for summary judgment on Jackson's Section 1983 First Amendment claim due to his failure to exhaust, they do not specifically argue that he failed to exhaust the claim itself by not identifying facts that would have put prison officials on notice that he was asserting a retaliation claim.  Based on the Court's review of the record, there is no genuine dispute of material fact as to Jackson's failure to exhaust his First Amendment retaliation claim against Defendants.  Grievance No. 965217 does not contain any information that would have put SCI Mahanoy officials on notice that Jackson claimed Defendants intentionally lost his legal materials in retaliation for him filing other grievances and lawsuits (none of which were against them).  As such, Defendants are entitled to judgment as a matter of law on Jackson's Section 1983 claim, and the cross-motions for summary judgment are

moot. Additionally, because the Court will grant summary judgment to Defendants on Jackson's only remaining federal claim, the Court will decline to exercise supplemental jurisdiction over his remaining state-law negligence claim and dismiss it.

### a.    Jackson's First Amendment Retaliation Claim

The PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." See 42 U.S.C. § 1997e(a). Stated differently, the exhaustion of available administrative remedies is a prerequisite for a prisoner asserting a claim under Section 1983 regarding their prison conditions. See Rinaldi v. United States, 904 F.3d 257, 265 (3d Cir. 2018); see also Ross v. Blake, 578 U.S. 632, 638 (2016) (reiterating that the PLRA's "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies" (quoting Woodford v. Ngo, 548 U.S. 81, 85 (2006))); Jones v. Bock, 549 U.S. 199, 211 (2007) (stating that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court" (citation omitted)); Booth v. Churner, 532 U.S. 731, 733–34 (2001) (stating that the PLRA "now requires a prisoner to exhaust 'such administrative remedies as are available' before suing over prison conditions" (quoting 42 U.S.C. § 1997e(a))).

"The PLRA requires proper exhaustion, meaning 'complet[ing] the administrative review process in accordance with the applicable procedural rules.'" Downey v. Pa. Dep't of Corr., 968 F.3d 299, 305 (3d Cir. 2020) (alteration in original) (quoting Woodford, 548 U.S. at 88). "These applicable procedural rules are supplied by the individual prisons." Id. (citations omitted); see also Spruill v. Gillis, 372 F.3d 218, 222 (3d Cir. 2004) (stating that "the determination [of]

whether a prisoner has 'properly' exhausted a claim . . . is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances"); Jones, 549 U.S. at 218 (explaining that "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim"); Woodford, 548 U.S. at 90 (indicating that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules").  A prisoner's failure to follow a prison's procedural rules will result in a procedural default of their claims.  See Spruill, 372 F.3d at 230–32 (concluding that PLRA's exhaustion requirement includes procedural default component); see also Drippe v. Tobelinski, 604 F.3d 778, 781 (3d Cir. 2010) (pointing out that Spruill held "that the PLRA includes a procedural default component and the determination whether a prisoner properly exhausted a claim is made by evaluating compliance with the prison's specific grievance procedures").  A procedural default may be excused, however, if the prisoner can show that the administrative remedies were unavailable to them.  See Rinaldi, 904 F.3d at 266 ("The PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available.'" (quoting Woodford, 548 U.S. at 93)).  "Available means capable of use; at hand." Small v. Camden County, 728 F.3d 265, 271 (3d Cir. 2013) (internal citations and quotation marks omitted).  "An administrative remedy is unavailable when it 'operates as a simple dead end[,] . . . is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" Downey, 968 F.3d at 305 (alterations in original) (quoting Shifflett v. Korszniak, 934 F.3d 356, 365 (3d Cir. 2019)).  "Although the availability of administrative remedies to a prisoner is a question of law, it necessarily involves a factual inquiry."  Small, 728 F.3d at 271.

In this case, the Court will not address Defendants' two (2) arguments pertaining to exhaustion—Jackson's failure to name Cobian and Evans or request monetary damages in Grievance No. 965217, because this grievance suffers from a more fundamental defect, namely, the failure to provide prison officials with notice that Jackson was asserting a retaliation claim against any Defendant.[14]  PLRA exhaustion "requires 'inmates [to] provide enough information

---

[14]  Defendants correctly point out that Jackson did not request any form of monetary relief in Grievance No. 965217 even though the grievance form directs inmates (such as Jackson) to "[s]tate all relief that [they are] seeking," see (Doc. No. 33-1 at 2), and DC-ADM 804 provides that, "[i]f the inmate desires compensation or other legal relief normally available from a court, the inmate must request the specific relief sought in his/her initial grievance." See (Doc. No. 33-3 at 10) (emphasis added).  In fact, Jackson stated that he was not seeking monetary relief. See (Doc. No. 33-1 at 3 ("Money isn't my motive, I simply request my [b]elongings now!")); see also (Doc. No. 37 ¶ 19 ("On January 24, 2022, Plaintiff filed a grievance requesting the return of his personal property[,] specifically his legal materials, and indicated that money wasn't his motive, he just wanted his legal material [sic]." (cleaned up)).  This failure results in a procedural default of Jackson's request for monetary damages as part of his Section 1983 First Amendment retaliation claim.  See, e.g., Wright v. Sauers, 729 F. App'x 225, 227 (3d Cir. 2018) (unpublished) (noting that prisoner-plaintiff's claim for monetary damages in federal court was procedurally defaulted under DC-ADM 804 because he failed to request monetary damages in his initial grievance with the DOC); Endrikat v. Ransom, No. 21-cv-01684, 2023 WL 3609157, at *4 (M.D. Pa. May 23, 2023) (discussing the requirements of DC-ADM 804 and concluding as follows: "by failing to request monetary damages in his initial grievance, [prisoner-plaintiff] failed to exhaust administrative remedies with respect to his claim for monetary damages"), aff'd sub nom. Endrikat v. Little, No. 23-2167, 2023 WL 8519196 (3d Cir. Dec. 8, 2023) (unpublished).

Additionally, although Jackson indicated in his appeal for final review to SOIGA that he was seeking $50,000 as an alternate form of relief, see (Doc. No. 53-1 at 3), SOIGA did not act to excuse his procedural default by considering his request for damages on the merits.  See, e.g., Bailey v. Yoder, No. 20-cv-01836, 2023 WL 7329526, at *3 (M.D. Pa. Nov. 7, 2023) (concluding plaintiff's claim for money damages was exhausted even though Plaintiff failed to include claim in original grievance because he sought money damages as part of his appeal and this request was considered on appeal and denied on its merits).  Instead, the responses to Jackson's appeals expressly stated that they did not consider any issues that he did not present in his initial grievance.  See (id. at 6 ("Additional issues you note in this appeal will not be addressed as they were not mentioned in your initial grievance"); id. at 7 ("Per the DC ADM 804 Section 2, B., issues presented in your appeal which weren't raised at the initial level will not be addressed.")).

about the conduct of which they complain to allow prison officials to take appropriate responsive measures.'" See Mack v. Warden Loretto FCI, 839 F.3d 286, 296 (3d Cir. 2016) (alteration in original) (quoting Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004)). "Restated slightly, an inmate's grievance must include facts sufficient to place prison officials on notice of the claim or claims to be investigated." Jackson v. O'Brien, No. 18-cv-00032, 2021 WL 5087922, at *6 (W.D. Pa. Nov. 2, 2021); see also (Doc. No. 33-3 at 10 ("The inmate shall specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law.")).

In this case, Jackson complains about missing and broken property in Grievance No. 965217. There is neither an explicit reference to a retaliation in the grievance nor any facts that would place the reviewing officials on notice that he believed that the events surrounding his missing or damaged property were due to retaliation, much less Defendants' retaliation. This lack of factual formation pertaining to any alleged retaliation is understandable considering that Jackson bases his retaliation claim on information Cobian provided to him on February 14, 2022, which was approximately three (3) weeks after he filed Grievance No. 965217. In other words,

---

The issue with Defendants' argument is that they appear to believe that Jackson's failure to request monetary damages results in his inability to prosecute his Section 1983 claim instead of resulting in his ability to seek only nominal damages. While they provide some support for this argument, see, e.g., Mills v. Rogers, No. 20-cv-00266, 2024 WL 3034099, at *18 (M.D. Pa. June 17, 2024) (concluding that plaintiff failed to exhaust requests for declaratory relief and nominal damages by including such requests in his grievance); Nelson v. Hauser, No. 22-cv-00686, 2023 WL 8602286, at *4 (M.D. Pa. Dec. 12, 2023) (concluding plaintiff failed to exhaust requests for declaratory relief and nominal damages, which were "the only types of relief possibly available in the instant lawsuit," because he failed to request declaratory relief or nominal damages in his grievance), it does not appear that the Third Circuit Court of Appeals or any other circuit court has addressed this specific argument. See, e.g., Gentilquore v. Bailey, No. 23-cv-01034, 2025 WL 861396, at *6 n.5 (M.D. Pa. Mar. 19, 2025) (noting that "it is unclear whether a request for nominal damages must be administratively exhausted" insofar as the Third Circuit has held that a plaintiff need not allege an entitlement to nominal damages in their complaint (citing Mitchell v. Horn, 318 F.3d 523, 533 n.8 (3d Cir. 2003))).

according to his own theory of this case, Jackson did not have reason to believe he was retaliated against until he talked to Cobian on February 14, 2022.

The Court recognizes that even though it is unnecessary for a plaintiff to "use the word 'retaliation' in [their] grievance to properly raise the claim, [they still] must include enough information to put prison officials on notice that the substance of the issue is retaliation." See Jackson, 2021 WL 5087922, at *6. Here, Grievance No. 965217 alerted prison officials that Jackson's remote control to his television was damaged, that he was missing certain property, and that he was unhappy about how his property was handled; however, it did not notify them about any possible retaliation. See, e.g., Vo v. Wetzel, No. 22-1210, 2022 WL 1467978, at *2 (3d Cir. May 10, 2022) (unpublished) (concluding that the district court "properly found that [the prisoner-plaintiff] failed to exhaust her equal protection claim for the confiscation of her art portfolio" because even though the plaintiff's "grievance informed prison officials that her property had been confiscated in contravention of the prison's policies, . . . it did not alert them to any issue of disparate treatment"). In fact, Jackson arguably needed to file a new grievance to the extent he believed that Defendants unlawfully retaliated against him. See Shifflet, 934 F.3d at 366 (concluding that prisoner-plaintiff failed to fully exhaust his First Amendment retaliation claim because it "was not the subject of any grievance he submitted," and "[r]etaliation is a separate claim, see White v. Napoleon, 897 F.2d 103, 111–12 (3d Cir. 1990), [which] must be separately grieved"); see also (Doc. No. 33-3 at 11 ("Any grievance based on separate events must be presented separately, unless it is necessary to combine the issues to support the claim."). In the end, since Grievance No. 965217 did not alert prison officials or otherwise place them on fair notice that Jackson was asserting retaliation claims against Defendants, it did not "initiate or exhaust Jackson's administrative remedies as to that claim." See Jackson, 2021 WL 5087922, at

*6; see also Brown v. U.S. Justice Dep't, 271 F. App'x 142, 145–46 (3d Cir. 2008)

(unpublished) (agreeing with district court that prisoner-plaintiff's grievance "did not put

Defendants on notice of a retaliatory transfer claim"); Quinn v. Palakovich, 204 F. App'x 116,

118 (3d Cir. 2006) (unpublished) (determining that prisoner-plaintiff's failure-to-protect claim

against correctional officials was not exhausted where the plaintiff's grievance included "brief

language about [his] slip-and-fall in the kitchen," which "serves only to describe the location of

his injury to the personnel receiving his grievance about his medical treatment"); Pew v. Little,

No. 22-cv-01488, 2025 WL 2471780, at *4 (E.D. Pa. Aug. 27, 2025) ("While Pew's grievance

alerted prison officials to his primary concern—that he had been denied an electric razor—Pew's

grievance makes no reference to discrimination vis-à-vis other inmates."); Simmons v. Gilmore,

No. 17-cv-00996, 2021 WL 1215773, at *11 (W.D. Pa. Mar. 31, 2021) (granting summary

judgment in favor of defendant prison officials on prisoner-plaintiff's First Amendment

retaliation claim for failure to exhaust where plaintiff's grievance "did not reasonably identify

the factual basis for, or otherwise put prison officials on notice of, a First Amendment retaliation

claim"). Accordingly, Defendants are entitled to summary judgment on Jackson's First

Amendment retaliation claim due to his failure to exhaust.[15]

    In reaching this decision, the Court recognizes that Defendants did not specifically

contend that they are entitled to summary judgment due to Jackson's failure to exhaust the claim

itself; instead, they focus on his failure to seek monetary relief as well as name Cobian and

---

[15] As explained supra, an inmate can demonstrate that a procedural default resulting from their
failure to specifically assert a claim in their initial grievance should be excused if they show that
the DOC considered such a claim on appeal and denied it on its merits. See Bailey, 2023 WL
7329526, at *3. Here, Jackson cannot make such a showing because the other documents
relating to Grievance No. 965217 demonstrate that prison officials did not consider him to have
asserted a retaliation claim and expressly declined to address any claim not raised in his initial
grievance. See (Doc. No. 37-1 at 2–7).

Evans in Grievance No. 965217.  See (Doc. No. 31 at 7 ("Grievance number 965217 was the only grievance related to property that was filed and appealed to final review during the relevant time-period.  Grievance number 965217 does not identify Defendants Cobian or Evans as involved in the events. Grievance number 965217 does not request monetary relief.")).  Even though Defendants did not assert that Jackson failed to exhaust the retaliation claim in their brief in support of their motion for summary judgment, district courts may grant summary judgment sua sponte "on grounds not raised by a party."  See Fed. R. Civ. P. 56(f)(2); see also Celotex Corp., 477 U.S. at 326 ("[D]istrict courts . . . possess the power to enter summary judgment sua sponte . . . .").  However, before doing so, the district court must ordinarily "giv[e] notice [to the nonmoving party] and a reasonable time to respond . . . ."  See Fed. R. Civ. P. 56(f); see also Celotex Corp., 477 U.S. at 326 (explaining that district courts' have power to grant summary judgment sua sponte "so long as the losing party was on notice that [they] had to come forward with all of [their] evidence"); Gibson v. Mayor & Council of City of Wilmington, 355 F.3d 215, 224–25 (3d Cir. 2004) (explaining that first providing notice to the nonmoving party before sua sponte granting summary judgment against them is the "preferred method by which to dispose of claims . . . not only because district courts run the risk of unduly prejudicing the parties, but also because such grants of summary judgment can have serious, if unintended, consequences").

In such circumstances, "notice" means "that the targeted party had reason to believe the court might reach the issue and receive a fair opportunity to put its best foot forward."  See Gibson, 355 F.3d at 223–24 (citation and internal quotation marks omitted).  Nevertheless, a district court may grant summary judgment sua sponte without prior notice if there is (1) a fully developed record, (2) a lack of prejudice, or (3) "a decision based on a purely legal issue."  See id. at 224; see also Cont'l Cas. Co. v. Pennsylvania Nat'l Mut. Cas. Ins. Co., No. 22-1087, 2022

WL 17101226, at *2 (3d Cir. Nov. 22, 2022) (pointing out that "we have recognized 'an exception to the notice requirement of Rule 56 in those cases where summary judgment is granted <u>sua</u> <u>sponte</u>' when three conditions are met: '(1) the point at issue is purely legal; (2) the record was fully developed[;] and (3) the failure to give notice does not prejudice the party[.]'" (quoting <u>Gibson</u>, 355 F.3d at 219)).[16]

In this case, the Court need not provide Jackson with notice and an opportunity to respond before granting summary judgment in favor of Defendants on his First Amendment retaliation claim for failure to exhaust. The record in this case is fully developed on the exhaustion issue. Jackson filed only one (1) grievance pertaining to his missing property, Grievance No. 965217, and the documents pertaining to that grievance are all part of the summary judgment record. In addition, the determination about whether Jackson failed to exhaust his First Amendment retaliation claim is a purely legal issue because there are no genuine disputes of material fact regarding the issue. In fact, Jackson moved for summary judgment on the ground he fully exhausted his administrative remedies on his First Amendment retaliation claim. <u>See</u> (Doc. Nos. 37 at 9–12; 42 at 2). Finally, Jackson is not prejudiced by the Court's decision to address it <u>sua</u> <u>sponte</u> insofar as the Court would reach the same conclusion even if he had advanced notice and an opportunity to respond. <u>See</u> <u>Rivera v. Wetzel</u>, No. 21-cv-00041, 2023 WL 4564922, at *7 (M.D. Pa. July 17, 2023) (granting summary judgment due to plaintiff's failure to exhaust where "the record is fully developed on the issue of exhaustion,

---

[16]  Even though the Third Circuit Court of Appeals in <u>Continental Casualty Co.</u> indicated that "three conditions" need to be met before a district court may grant summary judgment without providing notice and an opportunity to respond, <u>see</u> 2022 WL 17101226, at *2, it appears that <u>Gibson</u> did not decide whether all three grounds are needed. <u>See</u> 355 F.3d at 224 ("While there are three different grounds on which we could recognize an exception to the notice requirement in the case of <u>sua</u> <u>sponte</u> summary judgment[,] . . . we need not decide if fewer than all three would suffice as all three are present in the case at bar.").

Rivera is not prejudiced by the court raising the issue <u>sua</u> <u>sponte</u> since the same result would inevitably follow if the court gave advance notice, and the ruling is a purely legal question given that there are no issues of material fact as to whether Rivera exhausted administrative remedies"); <u>see also</u> <u>McLintock v. City of Philadelphia</u>, No. 20-3453, 2022 WL 395995, at *4 (3d Cir. Feb. 9, 2022) (unpublished) (concluding that "[e]ven if the District Court did <u>sua</u> <u>sponte</u> rule on McLintock's ability to demonstrate a prima facie case for discrimination, it was well within its bounds to do so" because all three (3) "conditions [were] satisfied here").

**b.    Jackson's State-Law Negligence Claim**

Jackson also has a pending state-law negligence claim against Defendants.  However, due to the Court's resolution of Jackson's Section 1983 claim, there is currently no viable federal claim before the Court supporting the exercise of supplemental jurisdiction over his state-law negligence claim.  <u>See</u> 28 U.S.C. 1367(c)(3); <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); <u>Hedges v. Musco</u>, 204 F.3d 109, 123 (3d Cir. 2000) (stating that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court <u>must</u> decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so").  The Court finds that consideration of "judicial economy, convenience, and fairness to the parties" does not "provide an affirmative justification" for retaining jurisdiction over Jackson's negligence claim.  <u>See</u> <u>Hedges</u>, 204 F.3d at 123.  Accordingly, the Court will decline to exercise supplemental jurisdiction over Jackson's

state-law negligence claim and dismiss that claim without prejudice to him refiling it in the appropriate Pennsylvania state court.[17]

### D.    Jackson's Motions for the Appointment of Counsel

Jackson has two (2) pending motions seeking the appointment of counsel (Doc. Nos. 41, 45), which constitute his third and fourth motions after the Court denied his first two (2) motions (Doc. Nos. 8, 10, 11, 23, 24).  In light of the resolution of his claims in this case, the Court will deny both motions as moot.[18]

## IV.    CONCLUSION

For the foregoing reasons, the Court will: (1) dismiss Jackson's claims against the two (2) Doe Defendants because he did not identify them through the course of discovery; (2) deem withdrawn Jackson's motion to amend or supplement his complaint since he failed to file a supporting brief in accordance with the Local Rules; (3) grant summary judgment sua sponte in

---

[17]  There is also no independent basis for jurisdiction over this state-law claim pursuant to the diversity jurisdiction statute, 28 U.S.C. § 1332(a), because Jackson does not sufficiently allege the citizenship of the parties insofar as he pleads only his place of incarceration and Defendants' places of employment.  See Washington v. Hovensa LLC, 652 F.3d 340, 344 (3d Cir. 2011) (stating that an individual is a citizen of the state where they are domiciled, meaning the state where they are physically present and intend to remain indefinitely); Pierro v. Kugel, 386 F. App'x 308, 309 (3d Cir. 2010) (unpublished) ("[T]he domicile of a prisoner before [their] imprisonment presumptively remains [their] domicile during [their] imprisonment.").  It also appears from his extensive litigation history that Jackson resided in Pennsylvania prior to his incarceration, and Defendants' place of employment suggests that some, if not all of Defendants, may be Pennsylvania citizens.  See Lincoln Ben. Life Co. v. AEI Life, LLC, 800 F.3d 99, 104 (3d Cir. 2015) (explaining that Section 1332(a) requires "complete diversity between all plaintiffs and all defendants," meaning that "no plaintiff may be a citizen of the same state as any defendant" (citations, internal quotation marks, and alterations omitted))  Moreover, it is probable that the amount in controversy for Jackson's negligence claim does not reach the $75,000 threshold.  See 28 U.S.C. § 1332(a) (requiring that "the matter in controversy exceed[] the sum or value of $75,000, exclusive of interest and costs").

[18]  Even if the Court did not deny these motions as moot, the Court would still deny them for essentially the same reasons stated in the denials of Jackson's prior motions seeking counsel.

Defendants' favor on Jackson's Section 1983 claim due to his failure to exhaust his administrative remedies; (4) decline to exercise supplemental jurisdiction over Jackson's remaining state-law negligence claim and, consequently, dismiss that claim without prejudice;[19] and (5) deny as moot the parties' cross-motions for summary judgment as well as Jackson's two (2) motions for the appointment of counsel.  An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

---

[19]  42 Pa. C.S. § 5103 provides the process that a litigant can follow to ensure that their claims dismissed in federal court can be transferred (by the litigant, not by the court) to state court to preserve the statute of limitations on any claim.